**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **8:08CV193** |
| | ) | |
| **$321,590.00 IN UNITED STATES** | ) | |
| **CURRENCY,** | ) | **MEMORANDUM** |
| | ) | **and** |
| **Defendant,** | ) | **ORDER** |
| | ) | |
| **RUCHIN PATEL,** | ) | |
| | ) | |
| **Claimant.** | ) | |

This is an action pursuant to 21 U.S.C. § 881 for the forfeiture of $321,590.00 in United States currency seized from the claimant, Ruchin Patel, on November 19, 2007. Pursuant to 28 U.S.C. § 636 and the consent of the parties,[1] the matter was tried to the undersigned magistrate judge on March 11-12, 2009, whereupon the case was deemed submitted for decision.

**FINDINGS OF FACT**

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355 and 1395, and pursuant to 21 U.S.C. § 881. The defendant property is $321,590.00 in United States Currency. The property was seized from the claimant on November 19, 2007, within the District of Nebraska and is presently in the District of Nebraska. The claimant filed a claim of ownership, pertaining to all of the defendant property. **See** Filing No. 21.

**A.     Traffic Stop**

On Wednesday November 19, 2007, at approximately 9:45 p.m., Nebraska State Patrol (NSP) Trooper Paul Hazard (Trooper Hazard) stopped a Chevrolet Impala being

---

[1]On October 20, 2008, United States District Judge Joseph F. Bataillon transferred this matter to the undersigned magistrate judge for disposition. **See** Filing No. 26.

driven by Miteshkumar Patel eastbound on Interstate 80.  Trooper Hazard observed the Impala travel left of the center line, then travel over the shoulder line and over the rumble bars for approximately 100 to 150 feet.  When Trooper Hazard moved closer to the Impala to conduct a registration check, he observed the driver using a cellular telephone with one hand and had the other hand resting behind his head.  Based on this conduct, Trooper Hazard determined the driver was driving carelessly and initiated a traffic stop.

Trooper Hazard has been with the NSP since 2002 and is currently assigned to traffic services.  As part of his job Trooper Hazard enforces traffic laws, issues traffic violation citations, and conducts criminal interdiction to intercept drugs, weapons, stolen property, illegal currency, or other contraband.  Trooper Hazard has received training in many areas of criminal interdiction.  Specifically, Trooper Hazard was taught to look for indicators of criminal activity including drug source cities, destination cities, religious articles in high profile areas, changes in behavior, cost efficiency of travel plans, and short-term or one-way rental of vehicles.  Trooper Hazard asks questions during every traffic stop which are associated with interdiction work.

Trooper Hazard approached the Impala on the passenger side and informed the driver of the reason for the stop.  Trooper Hazard also requested the driver's license and vehicle registration.  The driver provided a license and the rental agreement.  Trooper Hazard asked the driver what was going on, why he was driving all over the roadway.  The driver responded that he was just "relaxing and driving."  Trooper Hazard requested that the driver, who was then identified as Miteshkumar Patel, exit the Impala and sit in the patrol vehicle.  Trooper Hazard observed a religious article about the size of a credit card, which appeared to be a picture of a religious leader or god, placed near the speedometer of the Impala.  Trooper Hazard noticed the Impala's rental agreement had a name other than Miteshkumar Patel, so he requested identification from the other occupants of the Impala.  Ketul Patel was the front seat passenger.  Ruchin Patel, the claimant, was in the back seat.

Trooper Hazard and Miteshkumar Patel proceeded to the patrol vehicle and Trooper Hazard explained to Miteshkumar Patel why he should not talk on the phone while driving.  Miteshkumar Patel agreed he should pay closer attention to his driving.  Trooper Hazard

conducted a license and warrant check for all three occupants of the Impala. Meanwhile, Trooper Hazard asked Miteshkumar Patel about his travel plans. Miteshkumar Patel stated he and his cousins were traveling to Chicago for a wedding and they planned to stay for a few weeks. Miteshkumar Patel stated the men slept somewhere west of Denver, Colorado. Miteshkumar Patel also stated the Impala was rented to his cousin, Ruchin Patel.

Based on the warrant check, Trooper Hazard learned there was a warrant similarity for Ruchin Patel. Trooper Hazard approached the Impala and asked Ruchin Patel to exit and step away from the vehicle. After some discussion, Trooper Hazard sensed the warrant did not apply to the claimant, Ruchin Patel. Trooper Hazard then asked Ruchin Patel about his travel plans. Ruchin Patel stated the men were going to a cousin's wedding in Chicago. Ruchin Patel stated he did not know how long he would be in Chicago, but planned to return the Impala in Chicago, at the airport, and get a return ticket. Trooper Hazard made contact with Ketul Patel and asked him about his travel plans. Ketul Patel stated they had come from California and were traveling to a family member's wedding in Chicago. Ketul Patel stated he was only staying for a couple days and would be traveling home by plane on Saturday.

Trooper Hazard returned to his patrol vehicle to speak to Miteshkumar Patel. Trooper Hazard issued Miteshkumar Patel a warning for careless driving and driving to the left of center and on the shoulder. Trooper Hazard explained the warning, then told Miteshkumar Patel that he was free to go. The traffic stop lasted approximately twelve minutes. As Miteshkumar Patel began to exit the patrol vehicle, Trooper Hazard asked him if he had time for a few more questions. Miteshkumar Patel sat back into the patrol vehicle and said, sure he had time. Trooper Hazard asked Miteshkumar Patel if he knew about criminal interdiction; Miteshkumar Patel did not. Trooper Hazard explained that the NSP check for anything illegal going up and down the interstate systems. Trooper Hazard asked Miteshkumar Patel if there were large amounts of U.S. currency, marijuana, cocaine, heroine, weapons, or dead bodies in the vehicle. To each question, Miteshkumar Patel responded, "no." Specifically, when asked about the currency, Miteshkumar Patel looked at the officer and stated, "no." However, when asked about the other items, Miteshkumar

Patel had a dramatic change in behavior by physically moving away from Trooper Hazard and beginning to reach for the door handle.  Additionally, Miteshkumar Patel's nervousness increased during this time period.  Based on this response, Trooper Hazard asked Miteshkumar Patel if Trooper Harzard could search the Impala.  Miteshkumar Patel responded, "sure, I don't mind."  Trooper Hazard asked again to clarify and get either a yes, or no answer.  Miteshkumar Patel responded, "yes you can, go ahead."

Trooper Hazard asked for consent to search because he believed several indicators of criminal behavior were present including a religious article strategically placed where an officer would likely see it, the men were traveling from a source city to a destination city for contraband, Miteshkumar Patel's display of extreme nervousness which increased with the questions about contraband, Miteshkumar Patel's demeanor in attempting to physically distance himself from the officer, the men indicated they had slept at a rest area, the rental vehicle was a one-way two-day rental with the intent to change vehicles upon arrival at the destination, and one of the men stated he was returning home by taking a one-way plane ticket.  Trooper Hazard believed the travel plans were unusual and inconsistent with typical public behavior due to cost effectiveness.

Trooper Hazard allowed Miteshkumar Patel to exit the patrol vehicle and stand in the grass away from the roadway.  Trooper Hazard asked Ruchin Patel and Ketul Patel to exit the Impala and stand away from the roadway near Miteshkumar Patel.  Trooper Hazard briefly inspected the passenger compartment of the vehicle, then moved to the trunk.  Trooper Hazard removed some blankets from the trunk and opened a suitcase (Ex. 6).  Trooper Hazard removed some clothing from the suitcase and observed a Motorola cellular telephone box.  When he lifted the box, Trooper Hazard observed it was heavier than he expected.  Trooper Hazard opened the box and found the molding did not contain a telephone, but the portion of the box which is normally void contained bundles of U.S. currency (Ex. 7).  Trooper Hazard felt around in the suitcase and felt a sealed plastic bag. After finding the bundles of currency, Trooper Hazard believed the plastic bag contained contraband.

At that time he ordered the three former occupants of the Impala to lay on the ground and called for assistance from other officers.  Trooper Hazard ordered Miteshkumar

Patel to walk back and get into the back of the patrol vehicle, unhandcuffed.  Trooper Hazard asked Miteshkumar Patel about the money, Miteshkumar Patel responded, "It's not my money, it's my friends'."  Miteshkumar Patel stated there was about $50,000 in the Impala.   Trooper Hazard conducted a pat down of Ketul Patel and placed him, unhandcuffed, into the front seat of the patrol vehicle.  Trooper Hazard handcuffed Ruchin Patel and waited with him outside.  Trooper Hazard explained to all three men that they were not "under arrest," but being detained due to the large sum of money discovered in the Impala.

Trooper Hazard resumed the search of the Impala.  With a pocket knife, Trooper Hazard opened the plastic bag he had found earlier and found additional U.S. currency (Ex. 14).  Trooper Hazard spoke to Ruchin Patel who stated there was "a couple hundred thousand dollars" in the vehicle.  Ruchin Patel explained the money was in the vehicle because "they were buying a business right now" and "I have all the paperwork."  Ruchin Patel further stated, "I know you are thinking this is drug money."  Trooper Hazard told Ruchin Patel that he would have a chance to talk to some other people about it.  Trooper Hazard asked Ruchin Patel where any other currency was located and Ruchin Patel directed Trooper Hazard to a small gray handbag.  Trooper Hazard found five bundles of currency in the gray handbag.  The bundles were found placed between pieces of clothing and in the pockets of pants.  Trooper Hazard testified no paperwork related to the purchase of a business was located in the Impala.

At that time NSP Sergeant Joseph Lance Rogers arrived.  Trooper Hazard placed Ruchin Patel into the back seat of Sergeant Rogers' vehicle.  Ruchin Patel told Trooper Hazard they were not involved in anything and the money was not drug money.  Ruchin Patel stated the men were going to purchase a business.  Trooper Hazard told Ruchin Patel he was not under arrest and he would be able to make a statement to another officer at another time.  Ruchin Patel stated there were documents in the Impala to support his statements, but Trooper Hazard did not find the documents.  NSP Trooper Kevin Whetstine arrived at the scene.  The officers spoke about the incident, placed all evidence in the trunk of the Impala, and transported the Impala and its former occupants to the Kearney State Patrol Office for interviews and a detailed search.  Trooper Hazard

transported Miteshkumar Patel.  Sergeant Rogers transported Ruchin Patel.  Trooper Whetstine transported Ketul Patel.

The Impala was thoroughly searched at the Kearney State Patrol Office.  No drugs or drug paraphernalia were found in the Impala.  The officers found six bundles of currency in a black suitcase (Ex. 8) concealed in many of the pockets of a pair of jeans (Ex. 9-13).  The black suitcase had an airline name tag containing the letters "PATEL/MITESH" (Ex. 15).  Trooper Hazard found $1500 in cash, in the side compartment of the passenger side door of the Impala (Ex. 20).  The currency was folded in half with a rubber band (Ex. 20).  In total, the officers located 35 rubber banded bundles of U.S. currency.  The currency was in several different denominations and there were hand-written notes with amounts on some bundles.

Based on Trooper Hazard's experience and training, the manner of the packaging and concealment of the currency throughout the Impala contained several indicators that the currency was earned illegitimately as drug proceeds.  Trooper Hazard hand-counted the currency in the side door and one other bundle in order to get an estimate of the amount.  Based on the hand-count, Trooper Hazard estimated the Impala contained $300,000 to $350,000.  The exact amount is typically counted by a bank employee, with an NSP supervisor and an evidence technician.  In this case, the bank confirmed the amount as $321,590.

## B.     Discretionary Sniff

On November 19, 2007, NSP Trooper Michael Korte (Trooper Korte) and his service dog, Maximus, arrived at the scene of the Impala's traffic stop in a marked patrol truck.  However, all of the suspects had already been placed into patrol cars, so Trooper Korte proceeded to the Kearney, Nebraska, State Patrol Office.  Trooper Korte is assigned to the traffic division of Troop C in Grand Island, Nebraska, and has been with the NSP for thirteen years.  From October 2001 to December 2007, Trooper Korte was assigned to the police service dog division.  Trooper Korte was a canine handler for six years paired with Maximus, a Belgian Malinois.  Trooper Korte and Maximus were initially certified after a seven-week training course.  Trooper Korte and Maximus underwent additional monthly

6

training and yearly certifications throughout the period of their service.  Maximus was a dual purpose dog and trained for patrol work, including evidence recovery, handler protection, detention of suspects, and tracking, as well as drug detection.  Specifically, Maximus was certified for detection of marijuana, methamphetamine, cocaine, and heroin.  Maximus was a passive indication dog, as opposed to an aggressive indication dog.  An "indication" is the final prescribed behavior an officer would expect from a canine when the canine detects the odor of a drug.  Trooper Korte expects Maximus to immediately sit or lay down staring at the location of the strongest odor of any of the four controlled substances.  An "alert" is a noticeable change in the canine's behavior, for example Maximus will "go nasal" by closing his mouth and taking deep sniffs through his nose.  Additionally, Maximums would whip his head around to show he may have missed something or need to sniff a particular area more thoroughly.  Trooper Korte conducts a "discretionary sniff" by using a canine to ascertain whether U.S. currency bears the odor of a controlled substance.

On November 19, 2007, at the Patrol Office, Trooper Korte, intending to conduct a discretionary sniff on the currency, went into the offices to secure a location for the sniff.  Trooper Korte had conducted a discretionary sniff in the Patrol Office on one previous occasion.  Trooper Korte located a desk (Ex. 18) in an office area and a filing cabinet (Ex. 16) in a general area to conduct the sniff.  Trooper Korte then retrieved Maximus from the patrol truck, on a leash, to conduct a preliminary sniff of the area prior to concealing any U.S. currency.  Trooper Korte intended to determine whether any other contraband or distractions existed in the chosen locations.  Maximus did not show any alert or indication in the areas and was returned to the patrol truck.  Trooper Korte used plastic gloves to conceal several bundles of the subject U.S. currency into a filing cabinet drawer (Ex. 16-17).  Trooper Korte changed his gloves and concealed several more bundles of the currency in a desk drawer (Ex. 18-19).  These bundles had been located in a black suitcase and either in a cellular telephone box (the smaller bundle) or wrapped in heavy plastic and in a black trash bag (Ex. 14).  After waiting twenty minutes, Trooper Korte retrieved Maximus and conducted another sniff of the two areas.  Maximus indicated the

odor of a controlled substance by sitting and staring at each of the locations containing the subject currency.

Trooper Korte then used Maximus to conduct a preliminary sniff in the kitchen area, finding nothing, he returned Maximus to the patrol truck. Another bundle of currency, had been found in a pair of jeans in a gray suitcase separate from the other currency. Trooper Korte, using a third set of plastic gloves, moved the currency form the jeans and concealed the currency in the kitchen behind a cupboard door. After ten minutes, Trooper Korte retrieved Maximus on a leash and conducted a sniff of the kitchen area. Trooper Korte kept Maximus on a leash during the sniff due to the presence of other people, who were potentially distracting, in the area. Trooper Korte keeps Maximus on a leash during a sniff approximately 97% of the time. Maximus indicated the odor of controlled substance in the area where the currency was concealed. No controlled substances were found with any of the currency. Each sniff took approximately five minutes because Maximus was led around each search area three times during the preliminary sniffs. Trooper Korte did not conduct a sniff of any the currency found in the door of the vehicle.

## C.    Interviews

NSP Investigator Steven R. Kolb (Investigator Kolb) provided assistance related to the November 19, 2007, traffic stop to conduct interviews of the suspects. Investigator Kolb has been employed with the NSP for over 27 years and is currently assigned to the drug control division. Investigator Kolb typically works on drug-related cases. Investigator Kolb arrived at the Kearney, Nebraska, State Patrol Office between 11:00 p.m. and midnight, spoke with Trooper Hazard, and then interviewed all three occupants of the Impala. At the time of the interviews, Investigator Kolb did not know how much money was found in the vehicle, although he knew there were 34 bundles. Investigator Kolb first interviewed Miteshkumar Patel, who voluntarily waived or disclaimed an interest in the U.S. currency found in the Impala (Ex. 3).

Investigator Kolb's second interview on November 19, 2007, was with Ketul Patel. The interview took place in an eight-foot by ten-foot, windowless interview room. The room contained a small table and two or three chairs. Ketul Patel was not in handcuffs, or

8

otherwise physically restrained, during the interview.  Ketul Patel was not free to leave.
Ketul Patel appeared calm and cooperative.  Ketul Patel did not appear to be under the
influence of alcohol or any drug.  Investigator Kolb did not have any trouble speaking with
Ketul Patel in the English language.  Investigator Kolb obtained biographical information
and explained the interview was related to the large amount of cash found in the vehicle.
Ketul Patel answered questions about his travel plans by stating the three men traveled
from California, on Sunday afternoon, heading toward Chicago, Illinois.  Ketul Patel
explained Miteshkumar Patel, and Ketul Patel's brother Ruchin Patel, and he, were going
to the wedding of a distant cousin, and then possibly to purchase a business.  Ketul stated
he was traveling with the other men initially, but returning to California early, on Saturday,
by plane.  Ketul Patel stated he did not have any involvement with the money and did not
know where it came from.  Ketul Patel signed a voluntary disclaimer form stating he had
no claim or interest to any of the 34 bundles of U.S. currency found in the vehicle (Ex. 4).
However, Ketul Patel stated the money was placed in several areas around the vehicle so
that if one bag were taken, they would not lose all of the money.  The interview lasted less
than thirty minutes.

Lastly, Investigator Kolb interviewed Ruchin Patel in the same interview room.
Ruchin Patel was not restrained in any way, but he was not free to leave.  Investigator Kolb
did not have any trouble speaking with Ruchin Patel in the English language.  Ruchin Patel
did not appear to be intoxicated.  Ruchin Patel was somewhat cooperative and willing to
talk.  Investigator Kolb obtained biographical information and explained the interview was
related to the large amount of cash found in the vehicle.  Ruchin Patel answered questions
about his travel plans by stating the three men were traveling from California to Chicago,
Illinois.  Specifically, Ruchin Patel stated he was having a meeting the next day with an
attorney to possibly purchase a gas station in Peoria, Illinois.  Ruchin Patel also stated they
were going to attend a wedding for people related to Miteshkumar Patel.  Ruchin Patel was
listed as the renter of the rental car and stated he planned to turn in the car when he
arrived in Chicago and rent a less expensive car from O'Hare.  Additionally, Ruchin Patel
explained $200,000 of the currency found in the vehicle belonged to him and Ketul Patel,
from family and a bank loan.  Ruchin Patel told Investigator Kolb that the remaining funds

came from Miteshkumar Patel.  Ruchin Patel stated the vehicle contained approximately $350,000.  Investigator Kolb was surprised that Ruchin Patel did not know the exact amount of U.S. currency.  Investigator Kolb also asked Ruchin Patel why the other two individuals signed disclaimers for the currency.  Ruchin Patel explained the other two men were "silent partners" for the business and Ruchin Patel was responsible for the entire amount of currency.  The interview lasted approximately thirty minutes.  Investigator Kolb explained the currency would be seized and counted, but gave Ruchin Patel a receipt for "34 bundles."  Investigator Kolb told Ruchin Patel he could return the next day, after noon, for a receipt containing the exact amount.  Ruchin Patel returned for the receipt.  Ruchin Patel was not charged with any crime and was released after his interview.

**D.    Claimant's Explanation of Currency**

At trial, Ruchin Patel claimed ownership over all of the U.S. currency found in the Impala on November 19, 2007.  Ruchin Patel is 26 years old and lives with his parents in California.  Ruchin Patel was born on December 11, 1982, in Ahmedabad, India, came to the United States in 1989, and became a naturalized U.S. citizen on February 2, 1998.  **See, e.g.**, Ex. 24 p. 5.  Ruchin Patel works for his father.  Ruchin Patel graduated from Cal State San Bernardino with a bachelor's degree in finance.  Ruchin Patel testified he has never been in possession of a controlled substance and has never been arrested or had any dealings with people who have a connection to drugs.  Ruchin Patel testified the currency had not been involved in any drug transaction he was aware of.

At trial, Ruchin Patel testified he obtained the U.S. currency from his own savings, his father, and others for the purpose of purchasing a business in Illinois.  Ruchin Patel testified he sought to purchase a business outside of California based on pricing as convenience stores are cheaper outside of California.  In preparation for buying a business, Ruchin Patel engaged an attorney in Chicago.  The attorney assisted Ruchin Patel in applying for a liquor license (Ex. 24 - unsigned, undated application) and a lottery license; opening an escrow account and a bank account; and filling out other applications.  Ruchin Patel also opened two corporations, one for ownership of the land and one for ownership of the business.  Ruchin Patel testified there were three different businesses,

but he was most serious about the Peoria or Washington, Illinois, business.  The attorney drafted a purchase agreement for a gas station (Ex. 25).  The signed, but undated purchase agreement indicates the sale price is $2,475,000, for a gas station located on East Gate Drive in Washington, Illinois (Ex. 25 p. 2).  Ruchin Patel explained a portion of the currency, ten to fifteen percent, from the Impala was to be placed in the bank to secure a bank loan for the gas station purchase.  If the bank loan did not work out, Ruchin Patel intended to enter into a financing agreement with the seller of the gas station.  The remaining currency was to be used for inventory and other expenses.

Of the $321,590, Ruchin Patel testified he received $216,000 from his father, Natwar Patel; $20,000 from his uncle, Rajesh Sarda; and $25,000 from a family friend, Neelem Salthora.  Ruchin Patel stated he intended to pay the money back over time, but he did not have written agreements to do so.  Ruchin Patel testified $60,000 was money he had saved over time, including his income from working for his father and other gifts.  Specifically, Ruchin Patel has worked for his father since 2002.  He has filed tax returns since that time claiming wages of $11,042; $11,000; $9,600; $8,400; $8,400; and $11,300, respectively, for the years 2002 through 2007.  Additionally, during that period Ruchin Patel reported passive income and business losses associated with a rental property and a liquor store he owns in California.  Based on these activities, Ruchin Patel reported taxable income as $3,342; $3,200; $1,650; $0; $8,989, respectively, for the years 2002 through 2005, and 2007.[2]

On the evening of November 17, 2007, Ruchin Patel retrieved the cash from his father's safe by filling two plastic grocery bags with the currency.  On the morning of November 18, 2007, Ruchin Patel and his brother counted the money and wrapped or concealed it in their luggage for the trip to Illinois.  Ruchin Patel wrote notes on some of the bundles to indicate the amounts.  Most of the money was already in rubber banded bundles or paper-band wrappers.  Ruchin Patel placed some of the money in a plastic bag and in a cellular telephone box, and placed some of the money in and between clothes.  Ruchin Patel states he separated the money between different bags and clothing for his

---

[2]The tax return for 2006 was incomplete and did not show taxable income (Ex. 30).  However, adjusted gross income is listed as $4,941.

own safety from theft.  Ruchin Patel's clothing and some of the money were placed in the tan Dockers suitcase.  Although he had a bank account in California and one in Illinois, Ruchin Patel thought it would be easier to take the cash than go through the "hassle" of sending the money by wire transfer.  Ruchin Patel rented the Impala on November 18, 2007, shortly before the men left California.

At trial the claimant testified, that on November 19, 2007, he was traveling with his brother and Miteshkumar Patel toward Chicago, Illinois.  They intended to attend a wedding of a close relative of Miteshkumar Patel, but a distant relative of the brothers. Ruchin Patel's main reason for traveling was to purchase a business in Peoria, Illinois. Ruchin Patel had rented the car at the Ontario Airport in California, but because of the cost, he intended to rent a different vehicle when he arrived in Illinois.  Ruchin Patel owns a Toyota Camry, but rented a vehicle so he would not put a lot of miles on his own vehicle. On a previous visit to Illinois, Ruchin Patel had rented an apartment where he intended to stay during this trip.  Ruchin Patel testified he told Trooper Hazard the paperwork for the business he intended to purchase was contained in a black briefcase in the trunk of the Impala, but the trooper did not examine the paperwork (Ex. 6).

At the time of the traffic stop and during the trial, Ruchin Patel acknowledged that the manner of packaging and carrying the currency would make "anybody think the money is drug money."  However, Ruchin Patel stated he did not think about that when he prepared to leave California with the currency.  Ruchin Patel stated Miteshkumar Patel did not know how much money was in the Impala because it was not any of his business. However, Miteshkumar Patel did know there was some currency concealed in the Impala.

Ketul Patel testified at the trial.  Ketul Patel, the claimant's brother, is 27 years old and also lives with his parents in California.  Ketul Patel works with his father in his father's business.  Ketul Patel attended Cal State San Bernardino and California Paramedical and Technical College.  Ketul Patel testified he was traveling with his brother and a family friend, Miteshkumar Patel, whom he considers to be a cousin or brother, to Chicago to attend a wedding.  After the wedding, the men planned to look at a business opportunity. Ketul Patel testified he had an airline ticket to return to California within a couple days. Ketul Patel was not able to attend the wedding due to being in Nebraska, but he did take

his scheduled flight back to California.  Ketul Patel testified he has never been in possession of a controlled substance.  Ketul Patel saw the religious picture, but did not place it in the Impala.  Ketul Patel helped load the car and placed the money in bags.  He had never before traveled with that amount of cash.  The men placed the money in different suitcases and within the clothing in order to keep it separated.  The men were concerned about losing it or having it stolen.  Ketul Patel acknowledged it may have seemed odd, but he was used to doing business in cash.  The black suitcase in the Impala belonged to Ketul Patel.

Natwar S. Patel, the claimant's father, also testified at trial.  Natwar Patel came to the United States in 1985, and currently resides in a mobile home in California.  Natwar Patel owns a business, Daniel's Market, on the same lot as the mobile home.  Natwar Patel also resides in a home worth $900,000, which is in Yucaipa, California, approximately 22 miles from the business lot.  The business is worth about $900,000, plus $150,000 in inventory.  Natwar Patel has a convenience store, a liquor shop, and a smoke shop.  Natwar Patel first went into business in August 1990 and, last year, sold one establishment for $180,000, plus $35,000 in inventory.  Natwar Patel testified that in November 2007, he gave his son $321,000, in cash, because Ruchin Patel intended to buy a convenience store with a gas station in Peoria, Illinois.  The currency, denominated in 100s, 50s and 20s, was in bundles of $10,000, some in rubber bands.  The cash had been kept in a safe in the mobile home and amassed over time.  Natwar Patel stated some of the money belonged to the claimant.  Specifically, Natwar Patel explained $216,000 of the money was his and came from his cash savings based on doing business for 19 years.  The bundling of this money with rubber bands was done by Natwar Patel or his wife.  Natwar Patel stated his business, Daniel's Market, has receipts of about $600,000 each year resulting in about $40,000 profit each year.  Natwar Patel stated he does have a savings account containing about $35,000, and uses personal and business checking accounts on a limited basis, but conducts business mostly in cash.  Natwar Patel stated he does not take or deal drugs, nor did any of his money come from the sale of drugs.  Natwar Patel has other business interests, but did not intend to have a business interest in the business Ruchin Patel intended to purchase.

**CONCLUSIONS OF LAW**

**A.      Constitutionality of Obtaining Evidence**

Ruchin Patel did not file a motion to suppress evidence based on the officers'
conduct associated with the traffic stop, his detention, the search of the vehicle, or his
statements.    However, in a civil forfeiture action, the evidence relied upon by the
government is subject to the exclusionary rule, which is a mechanism designed to enforce
the Fourth Amendment.  **See _United States v. $404,905.00 in U.S. Currency_, 182 F.3d
643, 646 (8th Cir. 1999)**.  The Fourth Amendment guarantees the "right of the people to
be secure in their persons, houses, papers, and effects, against unreasonable searches
and seizures."   U.S. Const. amend. IV.   Specifically, the passenger in a vehicle may
challenge the legality of a stop and his detention, and argue suppression of evidence as
the fruit of illegal activity.   **_United States v. Lyton_, 161 F.3d 1168, 1170 (8th Cir. 1998)**.
Further, the claimant rented the vehicle, and was listed on the rental agreement, giving him
an objectively reasonable expectation of privacy in the vehicle.   **See _United States v.
Muhammad_, 58 F.3d 353, 355 (8th Cir. 1995)**.

A law enforcement officer's observation of a traffic violation provides probable cause
to stop a vehicle.   **_United States v. Long_, 532 F.3d 791, 795 (8th Cir. 2008)** (**citing
_Pennsylvania v. Mimms_, 434 U.S. 106, 109 (1977)**).   Here, Trooper Hazard personally
observed the Impala being driven left over the center line and right over the shoulder line
and rumble bars.   There is no dispute about whether Miteshkumar Patel was driving
carelessly by driving erratically while talking on a cellular telephone and raising his free arm
over his head.

Contemporaneous with a valid traffic stop, "the officer [is] entitled to conduct an
investigation reasonably related in scope to the circumstances that initially prompted the
stop." **_Untied States v. Lyons_, 486 F.3d 367, 371 (8th Cir. 2007)** (**quoting _United States
v. McCoy_, 200 F.3d 582, 584 (8th Cir. 2000)** (per curiam)).   In fact, a police officer may
detain the occupants while completing a number of routine tasks such as conducting
computerized checks of the vehicle registration, driver's license and criminal history; and
issuing a citation.   **_United States v. Peralez_, 526 F.3d 1115, 1119 (8th Cir. 2008)**; **see
also _United States v. Sokolow_, 490 U.S. 1, 7 (1989)**.   Additionally, a police officer may

inquire about a driver and other occupants' destination, purpose of the trip, and whether the police officer may search the vehicle. *Peralez*, 526 F.3d at 1119; *United States v. Gill*, 513 F.3d 836, 845 (8th Cir. 2008). Here, the traffic stop lasted approximately twelve minutes including additional questioning related to warrant similarity for one of the men. Additionally, the number of occupants of the Impala in relation to only one Trooper permissibly increased the length of the detention. The period between the end of the traffic stop and Miteshkumar Patel's consent to search was minimal and consensual. Such period did not constitute a detention.

A consent search must be voluntary. The Fourth Amendment test for valid consent to search is that the consent be voluntary and such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 40 (1996). The court will evaluate the voluntariness of the consent by examining both personal characteristics of the individual and environmental factors under the circumstances. **See** *United States v. Comstock*, 531 F.3d 667, 676-77 (8th Cir. 2008) (listing factors). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). The government bears the burden of proving voluntary consent to search by a preponderance of evidence. *United States v. Esquivel*, 507 F.3d 1154, 1159-60 (8th Cir. 2007).

In the present case, no evidence suggests Miteshkumar Patel was threatened, intimidated, or promised anything in return for giving consent to search the Impala. Miteshkumar Patel voluntarily verbally consented to the officer's request to search. Ruchin Patel also indicated his consent to the search by indicating certain containers that the officer should open to encounter additional bundled currency or documents. Miteshkumar Patel was the driver of the Impala and Ruchin Patel's name was on the rental agreement leading Trooper Hazard to reasonably believe those with authority voluntarily consented to the search. At no time did either Miteshkumar Patel or Ruchin Patel attempt to revoke consent to search or stop the search. Based on present facts, the court finds consent to search was knowingly and voluntarily given. Once Trooper Hazard located the currency,

which Miteshkumar Patel had previously denied having, Trooper Hazard had additional justification to further detain the vehicle and its occupants.

Finally, Ruchin Patel made a number of statements relied upon by the government. The touchstone for the admissibility of statements is voluntariness. *Brown v. Mississippi*, 297 U.S. 278, 279 (1936). A court must look to the totality of circumstances in determining whether or not the statements were voluntary. *Mincey v. Arizona*, 437 U.S. 385, 401 (1978); *Colorado v. Connelly*, 479 U.S. 157 (1986); *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). In this case, Ruchin Patel was not advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). However, Ruchin Patel was not placed under arrest. He was being detained, but was not restrained during Investigator Kolb's interview. Investigator Kolb described Ruchin Patel as cooperative. Ruchin Patel also appeared cooperative during the traffic stop and volunteered information to Trooper Hazard. Ruchin Patel does not deny the statements were made voluntarily. Here, the interview was relatively brief. There is no evidence to suggest Ruchin Patel was intimidated or coerced during the interview. The court finds Ruchin Patel's will was not overborne and he made statements to the officers voluntarily.

Based on the above findings, the court concludes the stop, detention, search, and statements related to this matter were constitutionally undertaken. Accordingly, the evidence gathered on November 19-20, 2007, may be used against Ruchin Patel for any reason.

## B.    Property's Connection to Criminal Offense

The currency, which is the subject of the instant action, was seized pursuant to 21 U.S.C. § 881. Specifically, "[s]ection 881(a)(6) is a weapon in the war on drugs." *United States v. $84,615.00 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004) (citation omitted). Section 881(a)(6) provides:

> The following shall be subject to forfeiture to the United States and no property right shall exist in them: . . .
> > (6) All moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed

chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this subchapter.

21 U.S.C. § 881(a). Accordingly, pursuant to 21 U.S.C. § 881(a)(6), all money furnished or intended to be furnished in exchange for illegal drugs or to facilitate illegal drug trafficking, and all drug proceeds is subject to civil forfeiture. *United States v. Thirty-Nine Thousand Eight Hundred Seventy-Three and No/100 Dollars ($39,873.00)*, 80 F.3d 317, 318 (8th Cir. 1996).

"[T]he burden is on the government to establish, by a preponderance of the evidence, that seized property is subject to forfeiture." *United States v. $124,700 in U.S. Currency*, 458 F.3d 822, 825 (8th Cir. 2006) (**citing** 18 U.S.C. § 983(c)(1)). The court will order forfeiture under 21 U.S.C. § 881 when the government establishes a "'substantial connection' between the property" and a controlled substance offense. 18 U.S.C. § 983(c)(3). Specifically, when it is shown the property was "used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense." 18 U.S.C. § 983(c)(3). "[T]he government does not have to show evidence of, or trace the money to, a particular transaction." *United States v. U.S. Currency in the Amount of $150,660.00*, 980 F.2d 1200, 1205 (8th Cir. 1992) (citations omitted). "Circumstantial evidence can be used by the United States to establish its burden of proof." *United States v. $84,615.00 in U.S. Currency*, 379 F.3d 496, 501 (8th Cir. 2004).

In this case, the government alleges that the currency recovered from the Impala was used to commit or facilitate the commission of a criminal offense, i.e., drug trafficking. At trial, the government presented only circumstantial evidence to establish a connection between the subject currency and drug trafficking. The government relies on the presence of the currency in a large sum and its manner of packaging in several rubber banded stacks. "Possession of a large sum of cash is "strong evidence" of a connection to drug activity." *$124,700 in U.S. Currency*, 458 F.3d at 825 (considering $124,700 a "very large sum"). Furthermore, "money seized . . . wrapped in rubber bands, . . . is characteristic of the way drug money is stored." *United States v. $12,390.00*, 956 F.2d 801, 806 (8th Cir.

1992) (forfeiture based on probable cause standard and included evidence of drug trafficking transactions at residence); see United States v. $117,920.00 in U.S. Currency, 413 F.3d 826, 829 (8th Cir. 2005) (finding large amount of currency, in rubber-banded bundles enclosed in plastic sack hidden beneath clothing in luggage supported forfeiture). Additionally, one court reasoned:

> A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack. They don't, because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. . . . Legitimate businesses wire cash between bank accounts or they convert large sums of cash into cashier's checks. . . . The obvious reason is that wiring a sum of money that large would have generated a currency transaction report, see 31 U.S.C. § 5313; 31 C.F.R. § 103.22; something that those who deal in drug proceeds want to avoid at all costs.

United States v. $242,484.00, 389 F.3d 1149, 1161 (11th Cir. 2004) (en banc) (internal citation omitted) (noting claimant offered no reason for failure to wire money).

In this case, the currency discovered in the Impala was wrapped in rubber bands or paper wrappers and separated into 35 different locations throughout the vehicle and luggage, including in the pockets of clothing. The ten bundles in paper wrappers appeared to have bank wrappers, but the currency did not appear to be newly issued. Some of these paper-wrapped bundles and a couple other bundles had hand-written notes on them about the amount of currency in the bundle. Additionally, a portion of the currency was hidden within the packing material of a cellular telephone box and a portion was sealed in a plastic bag. The amount of the currency and the manner in which it was bundled and concealed throughout the Impala provides strong evidence of a connection to drug activity.

Second, the government relies on the circumstances surrounding the discovery of currency and the statements made by the claimant and others. Although the three men from the Impala were consistent about their plans to attend a wedding, they did not have consistent plans about when they were leaving Illinois. The vehicle had been rented for one-way travel from California to Illinois. Miteshkumar Patel described Ruchin Patel as his cousin, then as his friend. Initially, Miteshkumar Patel denied the presence of a large sum

of money, then stated there was $50,000 after some cash was found.  Ruchin Patel stated there was "a couple hundred thousand" dollars in the vehicle and "I know you are thinking it is drug money."  Ruchin Patel stated to Trooper Hazard he intended to buy a business with the money, which is consistent with what he testified to in court.  However, during his interview after the stop, Ruchin Patel made statements which are inconsistent with his trial testimony.  Specifically, during his interview Ruchin Patel stated $200,000 of the currency belonged to him and his brother, and the remaining funds were from Miteshkumar Patel.  When told Ketul Patel and Miteshkumar Patel denied any ownership in the money, Ruchin Patel stated the two men were "silent partners" in the business venture.  Similarly, Ruchin Patel did not appear to know the exact amount of money in the Impala.  In contrast, at trial Ruchin Patel explained the money was his from gifts, earnings, and investments made by his father and two others in precise amounts.  He also testified he had counted the money and placed the money in the luggage and vehicle himself, with the help of Ketul Patel.  Further, although Ruchin Patel received a bachelor's degree in finance in college, he says he thought it would be easier and less of a "hassle" to carry the money in cash, rather than convert it to a cashier's check or wire transfer.  Based on his statements to the officers, Ruchin Patel intended to return the Impala in Chicago and obtain a less expensive rental car, then either drive or fly back to California, when he completed his business.

The nature of the travel itinerary may cast doubt on the explanation for travel and origin of or use of currency.  **See** *United States v. $121,100.00 in U.S. Currency*, 999 F.2d 1503, 1507 (11th Cir. 1993); **see also** *United States v. Sokolow*, 490 U.S. 1, 8 (1989) ("Paying $2,100 in cash for two airplane tickets is out of the ordinary.").  The Eighth Circuit has previously held travel between California and Illinois, that is between a drug source and drug destination state, to be evidence supporting civil forfeiture. *United States v. $141,770.00 in U.S. Currency*, 157 F.3d 600, 602, 604 (8th Cir. 1998) (using probable cause standard).  In *$141,770.00 in U.S. Currency*, the court also relied on the amount of currency and a police canine's alert to the currency and the vehicle, but stated, "Most important, however, is the telltale packaging in which the seized currency was found." *Id.* at 604 (currency concealed in a secret ceiling compartment of a camper, wrapped in scented fabric softener sheets and sealed in three layers of zip-lock bags).

In this case, the statements made by the claimant concerning the currency are unusual given the convenience of conventional banking for many. However, the use of currency, rather than other forms of payment for business, does not provide a "substantial connection" between this currency and drug trafficking. However, the sum of currency was very large and concealed throughout the vehicle. Some of the currency was in plastic, but there is no other evidence the claimant was trying to mask the odor of the currency. **Cf. *$141,770.00 in U.S. Currency*, 157 F.3d at 604 n.4** (claimant admitted attempting to mask odor of currency from drug detection dogs). The claimant explained the placement and concealment of the currency was based on his fear of theft, however such fear could have been eliminated by moving the currency in a more conventional manner. The court finds the claimant's explanation unbelievable and incredible. Similarly, the claimant's explanation of the origin of the currency and its intended use is unbelievable and incredible. The claimant's explanation for the money has changed from the time of the traffic stop, his interview, and trial. ***$84,615.00 in U.S. Currency*, 379 F.3d at 502** (claimants behavior during police contact undermined the credibility of his assertions of legitimate reasons for possessing the money). In addition, the claimant has failed to provide credible or sufficient corroboration for his explanation.

Third, the fact a police canine indicates the odor of narcotics is present on currency supports forfeiture. ***$124,700 in U.S. Currency*, 458 F.3d at 826**. A police canine's alert to currency "provides some-albeit slight-indication" that the subject currency is connected to drug trafficking. ***$84,615.00 in U.S. Currency*, 379 F.3d at 502**. Here, Maximus indicated the odor of controlled substances on the currency taken from the Impala. Additionally, Maximus indicated the odor of controlled substances on three separate portions of the currency. The government did not provide expert or other scientific evidence to warrant any stronger probative value of the canine's indication. This is particularly true where no evidence of any narcotics or other contraband was found in the Impala or otherwise connected with the currency. **Cf. *$84,615.00 in U.S. Currency*, 379 F.3d at 501**. The Impala's occupants made no admissions of guilt. ***Cf. id.***

The court concludes the government has met its burden of establishing, by a preponderance of the evidence, that the seized property is subject to forfeiture. The

government met its burden based upon the large sum of the currency, which was wrapped and concealed in an unusual manner and contained an odor of controlled substances, coupled with the claimant's unusual and contradictory travel itinerary and other inconsistent statements. This circumstantial evidence demonstrates a substantial connection between the defendant property and drug trafficking.

## B.   Innocent Owner Defense

Even where a court determines the government established a substantial connection between property and a controlled substance offense, "[a]n innocent owner's interest in the property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1). This exception to 21 U.S.C. § 881(a) is known as the innocent owner defense by a claimant. "The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence." 18 U.S.C. § 983(d)(1). Section 983(d)(2)(A) further defines innocent owner:

> With respect to a property interest in existence at the time the illegal conduct giving rise to forfeiture took place, the term "innocent owner" means an owner who--
> (i)    did not know of the conduct giving rise to forfeiture; or
> (ii)   upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.

18 U.S.C. § 983(d)(2)(A).

Ruchin Patel claims he obtained the defendant currency from legitimate sources. Ruchin Patel explained the currency was a combination of his own savings over the course of several years, plus informal loans from his father, uncle, and a family friend. Ruchin Patel and his father testified about how the family, in conjunction with the family business, keeps cash in a safe. Such money is used for business and personal expenses and savings. Additionally, the money is typically bundled and secured by rubber bands in the ordinary course of business. This was done even though both Ruchin Patel and his father have multiple bank accounts and have been involved in business investments for many years. Ruchin Patel also states that if any of the currency was related to illegal conduct, then he did not know of the conduct.

The court does not find Ruchin Patel's explanation for the currency to be credible. Although Ruchin Patel gave a similar explanation at trial to the one he gave to officers at the time of his the traffic stop, the court notes several discrepancies.  Additionally, the currency was not stored in a manner consistent with the separate origins described. Ruchin Patel, with a college degree in finance, did not know the exact amount of currency involved at the time of the traffic stop.  Additionally, the documentation and testimony used to support his explanation fails to corroborate Ruchin Patel's account.

The court holds the government has proven by a preponderance of the evidence that there is a substantial connection between the defendant currency and the criminal offense of drug trafficking.  The circumstantial evidence provided by the government includes the facts that a very large sum of money was found wrapped in 35 rubber banded bundles and concealed throughout clothing in luggage in a rental car.  Additionally, the occupants of the rental car had an unusual itinerary and lied or told conflicting stories about the currency.  Finally, Ruchin Patel's rebuttal testimony lacked credibility in several material respects.  Accordingly, the court also finds no credible evidence supporting Ruchin Patel's claim that he is an innocent owner of the defendant currency.  Upon consideration,

**IT IS ORDERED**:

1. The Court concludes the defendant currency should be forfeited to the United States and judgment should be entered in favor of the government and against the claimant.

2. A separate judgment will be entered contemporaneously with this Memorandum and Order.

DATED this 15th day of June, 2009.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge

22